UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JANET L. LANE,

    *Plaintiff*,

v.                              CASE NO. 11-CV-12230

COMMISSIONER OF            DISTRICT JUDGE GERALD E. ROSEN
SOCIAL SECURITY,            MAGISTRATE JUDGE CHARLES E. BINDER

    *Defendant*.

_____/

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION[1]

### I.    RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence supports the Commissioner's determination that Plaintiff is not disabled. Accordingly, **IT IS RECOMMENDED** that Plaintiff's Motion for Summary Judgment be **DENIED**, that Defendant's Motion for Summary Judgment be **GRANTED**, and that the findings of the Commissioner be **AFFIRMED**.

### II.    REPORT

#### A.    Introduction and Procedural History

Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to this magistrate judge for the purpose of reviewing the Commissioner's decision denying Plaintiff's claims for a period of disability and Disability

---

[1] The format and style of this Report and Recommendation are intended to comply with the requirements of the E-Government Act of 2002, Pub. L. 107-347, 116 Stat. 2899 (Dec. 17, 2002), the recently amended provisions of Fed. R. Civ. P. 5.2(c)(2)(B), E.D. Mich. Administrative Order 07-AO-030, and guidance promulgated by the Administrative Office of the United States Courts found at: http://jnet.ao.dcn/img/assets/5710/dir7-108.pdf. This Report and Recommendation only addresses the matters at issue in this case and is not intended for publication in an official reporter or to serve as precedent.

Insurance Benefits ("DIB"), and for Supplemental Security Income ("SSI") benefits. This matter is currently before the Court on cross-motions for summary judgment. (Docs. 8, 9.)

Plaintiff was 49 years of age at the time of the most recent administrative hearing. (Transcript, Doc. 6 at 11, 103, 106.) Plaintiff's employment history includes cleaning business offices for four years and clerical work for ten years. (Tr. at 120.) Plaintiff filed the instant claims on August 13, 2007, alleging that she became unable to work on June 17, 2007. (Tr. at 103, 106.) The claim was denied at the initial administrative stages. (Tr. at 65, 66.) In denying Plaintiff's claims, the Commissioner considered S/P Left L4 - L5 hemilaminectomy and diskectomy with post-operative staph wound as possible bases for disability. (*Id.*) On December 14, 2009, Plaintiff appeared before Administrative Law Judge ("ALJ") John Dodson, who considered the application for benefits *de novo*. (Tr. at 8-19, 47.) In a decision dated March 12, 2010, the ALJ found that Plaintiff was not disabled. (Tr. at 19.) Plaintiff requested a review of this decision on April 9, 2010. (Tr. at 6.)

The ALJ's decision became the final decision of the Commissioner, *see Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 543-44 (6th Cir. 2004), on March 12, 2011, when the Appeals Council denied Plaintiff's request for review. (Tr. at 1-4.) On May 23, 2011, Plaintiff filed the instant suit seeking judicial review of the Commissioner's unfavorable decision.

**B.      Standard of Review**

In enacting the social security system, Congress created a two-tiered structure in which the administrative agency handles claims and the judiciary merely reviews the determination for exceeding statutory authority or for being arbitrary and capricious. *Sullivan v. Zebley*, 493 U.S. 521, 110 S. Ct. 885, 890, 107 L. Ed. 2d 967 (1990). The administrative process itself is multifaceted in that a state agency makes an initial determination that can be appealed first to the

agency itself, then to an ALJ, and finally to the Appeals Council. *Bowen v. Yuckert*, 482 U.S. 137, 142, 107 S. Ct. 2287, 96 L. Ed. 2d 119 (1987). If relief is not found during the administrative review process, the claimant may file an action in federal district court. *Id.*; *Mullen v. Bowen*, 800 F.2d 535, 537 (6th Cir. 1986) (en banc).

This Court has original jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited in that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005). *See also Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). In deciding whether substantial evidence supports the ALJ's decision, "we do not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007). *See also Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

"It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007). *See also Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007) (the "ALJ's credibility determinations about the claimant are to be given great weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and credibility'") (citing *Walters*, 127 F.3d at 531 ("Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among medical reports, claimant's testimony, and other evidence")); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003) (an "ALJ is not required to accept a claimant's subjective complaints and may . . . consider the credibility of a claimant when making a determination of disability."). "However, the ALJ is not free to make credibility determinations

based solely upon an 'intangible or intuitive notion about an individual's credibility.'" *Rogers,* 486 F.3d at 247 (quoting S.S.R. 96-7p, 1996 WL 374186, at *4).

If supported by substantial evidence, the Commissioner's findings of fact are conclusive. 42 U.S.C. § 405(g). Therefore, a court may not reverse the Commissioner's decision merely because it disagrees or because "there exists in the record substantial evidence to support a different conclusion." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006). *See also Mullen*, 800 F.2d at 545. The scope of a court's review is limited to an examination of the record only. *Bass,* 499 F.3d at 512-13; *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers,* 486 F.3d at 241. *See also Jones*, 336 F.3d at 475. "The substantial evidence standard presupposes that there is a 'zone of choice' within which the Commissioner may proceed without interference from the courts." *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) (citations omitted) (citing *Mullen*, 800 F.2d at 545).

When reviewing the Commissioner's factual findings for substantial evidence, a reviewing court must consider the evidence in the record as a whole, including that evidence which might subtract from its weight. *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). "Both the court of appeals and the district court may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). There is no requirement, however, that either the ALJ or the reviewing court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. App'x 496, 508 (6th Cir. 2006) ("[a]n ALJ can consider all the evidence

4

without directly addressing in his written decision every piece of evidence submitted by a party"); *Van Der Maas v. Comm'r of Soc. Sec.*, 198 Fed. App'x 521, 526 (6th Cir. 2006).

### C.  Governing Law

The "[c]laimant bears the burden of proving his entitlement to benefits." *Boyes v. Sec'y of Health & Human Servs.*, 46 F.3d 510, 512 (6th Cir. 1994). *Accord Bartyzel v. Comm'r of Soc. Sec.*, 74 Fed. App'x 515, 524 (6th Cir. 2003). There are several benefits programs under the Act, including the Disability Insurance Benefits ("DIB") program of Title II, 42 U.S.C. §§ 401 *et seq.*, and the SSI program of Title XVI, 42 U.S.C. §§ 1381 *et seq.* Title II benefits are available to qualifying wage earners who become disabled prior to the expiration of their insured status; Title XVI benefits are available to poverty stricken adults and children who become disabled. F. Bloch, Federal Disability Law and Practice § 1.1 (1984). While the two programs have different eligibility requirements, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe

impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.

Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston,* 245 F.3d at 534. "If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates." *Colvin,* 475 F.3d at 730.

"Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his] impairments and the fact that [he] is precluded from performing [his] past relevant work[.]" *Jones*, 336 F.3d at 474 (cited with approval in *Cruse,* 502 F.3d at 540). If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the Commissioner. *Combs v. Comm'r*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [claimant] could perform given [his] RFC [residual functional capacity] and considering relevant vocational factors." *Rogers,* 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

### D. ALJ Findings

The ALJ applied the Commissioner's five-step disability analysis to Plaintiff's claim and found at step one that Plaintiff met the insured status requirements through September 30, 2012, and that Plaintiff had not engaged in substantial gainful activity since June 15, 2007, the alleged onset date. (Tr. at 13.) At step two, the ALJ found that Plaintiff's lumbar disc disease, status post multiple surgical procedures with postoperative infection, osteoarthritis of the hips, pelvis and right

6

knee, morbid obesity, and major depressive disorder were "severe" within the meaning of the second sequential step. (*Id.*) At step three, the ALJ found no evidence that Plaintiff's combination of impairments met or equaled one of the listings in the regulations. (Tr. at 15-16.) At step four, the ALJ found that Plaintiff could not perform any of her past relevant work. (Tr. at 17.) The ALJ also found that on the alleged disability onset date, Plaintiff was a younger individual age 45-49. (*Id.*) At step five, the ALJ found that Plaintiff could perform a limited range of sedentary work. (Tr. at 16-17.) Therefore, the ALJ found that Plaintiff was not disabled. (Tr. at 18-19.)

### E. Administrative Record

#### 1. Physical Impairments

##### a. Back or Spine

A review of the relevant medical evidence contained in the administrative record indicates that Plaintiff has been treated for back pain since 2007. On March 29, 2007, an MRI of the lumbosacral spine showed "[m]oderate sized left paracentral disc protrusion at the L4 - L5 level" and "[t]iny central disc protrusion at the L5 - S1 level." (Tr. at 236.)

On June 20, 2007, Plaintiff underwent a left L4 - L5 hemilaminectomy performed by Lucia Zamorano, M.D. (Tr. at 173-233.) On August 30, 2007, Plaintiff went to the emergency room complaining of pain in her lower back caused by a post-operative staph infection that had been treated with antibiotic therapy and a surgically-performed drainage on August 20, 2007. (Tr. at 173-233, 180, 258-66.) Upon release from the hospital, Plaintiff's "wound was showing minimal discharge." (Tr. at 190.)

An Physical Residual Functional Capacity Assessment completed on November 2, 2007, indicated that Plaintiff could occasionally lift 20 pounds, frequently lift 10 pounds, stand or walk for about 6 hours in an 8-hour workday, sit for about 6 hours in an 8-hour workday, and that she

was unlimited in her ability to push or pull. (Tr. at 272.) The assessment also found that Plaintiff was occasionally limited in all postural areas, but no manipulative, visual, communicative, or environmental limitations were found. (Tr. at 273-75.)

X-rays of the lumbar spine taken on May 14, 2008, showed "[d]egenerative changes [of the] lumbar spine without instability." (Tr. at 288.) A chest x-ray taken on July 21, 2008, was "negative," i.e., normal. (Tr. at 287.)

On July 28, 2008, an "L4 - L5 right hemilaminectomy with neurolysis, facetectomy, diskectomy and fusion with interbody cage with instrumentation on the right" was performed by Hazem A. Eltahawy, M.D. (Tr. at 280-84, 290-92.) Plaintiff followed up with Dr. Eltahawy after surgery. (Tr. at 432-500.) On November 4, 2008, Plaintiff reported "doing relatively well" and that her pain was at "an acceptable level." (Tr. at 435.) On November 25, 2008, Dr. Eltahawy noted that Plaintiff "did well following surgery and has progressed nicely." (Tr. at 433.) However, because Plaintiff continued to report hip pain, a CT scan was done and it revealed that the lumbar spine's fusion was "in place and the instrumentation in line." (Tr. at 433.) Dr. Eltahawy noted, however, that due to findings of "bilateral sacroiliac joint arthritis, and also femoral bone spur," Plaintiff would be sent to orthopedics. (*Id.*)

Plaintiff participated in physical therapy at the Rehabilitation Institute of Michigan beginning in January 2009. (Tr. at 293-332.) On January 19, 2009, Plaintiff reported that her back was "feeling pretty good" and that she was "getting better going up the stairs." (Tr. at 296.) On January 23, 2009, Plaintiff felt "pretty good today" and stated that she "when she isn't bending over she can sweep without pain." (Tr. at 297.) On January 30, 2009, Plaintiff had no complaints. (Tr. at 304.) On February 4, 2009, Plaintiff "stated she is doing good today." (Tr. at 305.) On February 9, 2009, Plaintiff "stated not a lot of pain, even though she fell this morning." (Tr. at

306.) On February 13, 2009, Plaintiff reported nothing was new and the therapist noted that Plaintiff was fatigued at the end of the exercises and reported a goal of increasing Plaintiff's endurance on standing exercises. (Tr. at 307.) On February 18, 2009, Plaintiff "stated she is sore on the inside of her right knee down to her calf," but the therapist noted that Plaintiff tolerated the day's exercises well. (Tr. at 308.) On May 15, 2009, Plaintiff reported "some soreness on/off on inside of knee." (Tr. at 318.) On May 20, 2009, Plaintiff reported a decrease in knee pain. (Tr. at 319.) On June 8, 2009, Plaintiff reported noticing that most knee pain occurred during prolonged sitting. (Tr. at 322.)

  **b.** **Knees**

Plaintiff also sought treatment with Shelley Street, M.D., for knee pain. (Tr. at 393-419.) On May 6, 2009, x-rays of the knee showed "alignment of the knee appears normal," a "[m]ild tibial varus deformity," "[m]ild chondromalacia in the right patella" and "no significant joint effusion." (Tr. at 408.) An x-ray taken on September 23, 2009, showed "[o]steoarthritis [in the] left knee" and "[p]atellofemoral syndrome with mild patellar tendinitis." (Tr. at 395.) Plaintiff was treated with hyaluronic acid injections. (Tr. at 397-98, 399-400, 401-02.)

  **c.** **Hips**

Plaintiff also sought treatment with Maan A. Askar, M.D., for hip pain. (Tr. at 420-25.) On December 17, 2008, x-rays of Plaintiff's hips revealed that Plaintiff's "[h]ip joints are intact. No periarticular calcification. Osseous mineralization is satisfactory. No fracture, dislocation or destructive lesion." (Tr. at 422.) Therefore, the impression was an "[u]nremarkable bilateral hip." (Tr. at 423.)

  **2.** **Mental Impairment**

Plaintiff also sought treatment with the Pioneer Counseling Center beginning in November 2007. (Tr. at 333-92.) In addition to counseling, Plaintiff was treated with prescription medicine (Tr. at 345, 348-49, 353, 366, 369, 378, 389, 392.)

On January 9, 2008, it was noted that Plaintiff's mood had improved and that she was "thinking about returning to her hobbies." (Tr. at 350.) However, on February 19, 2008, it was noted that Plaintiff was feeling depressed and experiencing crying spells, loneliness and sleep problems. (Tr. at 351.) On February 27 and March 2, 2008, Plaintiff reported that she was angry with her daughter because her daughter was undermining and manipulating her. (Tr. at 352, 354.) On March 10, 2008, Plaintiff stated that she wanted a new doctor because she felt her doctor was not listening to her. (Tr. at 355.) On May 14, 2008, Plaintiff reported that she "has been feeling motivated to do spring cleaning and some gardening" and that she "attended church last Sunday." (Tr. at 364.) Plaintiff was discharged on June 11, 2008, because her benefits were exhausted. (Tr. at 370.) Her course of treatment was summarized as "parenting techniques, relaxation techniques, occupational suggestions, [and] supportive therapy." (Tr. at 370.)

Plaintiff began counseling again in January 2009. (Tr. at 371-92.) On March 9, 2009, Plaintiff reported "better sleep since change in taking meds at dinner[,] [n]o problems with daughter[,] [and that she] [h]as been active at church." (Tr. at 380.) On June 8, 2009, it was noted that Plaintiff "remains busy with daughter, family and church group." (Tr. at 387.) It was also noted that Plaintiff's progress towards treatment goals was "stable." (*Id.*) On June 29, 2009, it was noted that Plaintiff's progress toward treatment goals was "staying active, mood stable." (Tr. at 388.) On July 29, 2009, it was noted that Plaintiff had been busy with "church activities" and that her progress was "stable." (Tr. at 390.)

10

On September 9, 2009, Plaintiff was referred to Terry Rudolph, Ph.D., Licensed Psychologist, for an evaluation to assess her capacity to provide a safe and nurturing environment for her children and capacity to learn parenting and coping skills." (Tr. at 426-31, 430.) Plaintiff "came to the attention of Children's Protective Services because of allegations that she may have solicited her daughter on the internet in hopes of getting a laptop and a car." (Tr. at 430.) Plaintiff was diagnosed with major depressive disorder, recurrent severe. (Tr. at 431.) Dr. Randolph also noted that Plaintiff "has the capacity to learn and retain new material" and that she "would benefit from parenting classes to assist her in understanding normal child development, setting appropriate roles and boundaries, and developing ways of dealing with the social and emotional needs of her daughter." (Tr. at 431.) In addition, Dr. Randolph noted that Plaintiff "would benefit from continued outpatient psychotherapy to address her depression and anger issues." (*Id.*) Finally, Dr. Randolph noted that "[i]n the event that Ms. Lane's daughter is returned to her care, she and her daughter would benefit from family therapy to improve communications and to facilitate the development of appropriate roles, boundaries and expectations of each other." (*Id.*)

### 3.     **Plaintiff's Testimony**

Plaintiff indicated in her daily activity report that she sews, watches television, does crafts, and reads. (Tr. at 147.) Plaintiff testified at the administrative hearing that, since June 2007, she has periodically walked with a cane that was prescribed for her by her family doctor. (Tr. at 52.) She further testified that due to pain in her back and sometimes in her knee, she can only walk about half a block, stand for about 20 minutes, and sit for 15 minutes without changing positions. (Tr. at 53-54.) Plaintiff also testified that she can pick up a gallon of milk, but cannot carry it. (Tr. at 54.)

Plaintiff indicated that she would need to lie down for fifteen minutes "probably three to four" times per eight-hour day and that doing so would help "some." (Tr. at 55.) She further stated that she elevates her knee "[m]aybe six times a day" and that she coordinates this with her need to lie down. (Tr. at 55-56.) Plaintiff testified that, although it is difficult, she is able to walk the six stairs in her house everyday. (Tr. at 56.) Plaintiff helps fold laundry and is able to make simple meals like cereal or a sandwich, but other family members do the cooking. (Tr. at 57.) Plaintiff stated that she is able to drive but, at the time of the hearing, she did not own a car or have a driver's license. (Tr. at 58.) Plaintiff also indicated that she continues to go to counseling at New Passages and continues to take Lexapro, Abililify, and Temazpan to help her sleep. (Tr. at 58-59.) Plaintiff stated that she did not have any side effects such as drowsiness or dizziness from the pain killers that she takes. (Tr. at 59.)

### 4. Vocational Evidence

The ALJ asked the Vocational Expert ("VE") to assume a person with Plaintiff's background who is:

> capable of light [sic]; no ropes, ladders or scaffolds; only occasional climbing of ramps or stairs, balancing, stooping, kneeling, crouching and crawling. I'm sorry, let me withdraw that. Let's change to sedentary.

(Tr. at 61.) The VE responded that there was a "host of sedentary activities," such as telemarketer, cashier II, surveillance monitor, and information clerk, all at the unskilled level, and billing clerk, receptionist, telephone answering operator, etc., at the semi-skilled level, with 20,000 such jobs available in the Southeast area of Michigan. (Tr. at 61-62.) When asked whether, in addition to the limitations in the hypothetical, a person would be employable who needed to lie down three to four times a day for up to 30 minutes, the VE responded that such a person could not perform any job. (Tr. at 62.)

12

### F.     Analysis and Conclusions

#### 1.     Legal Standards

The ALJ determined that during the time Plaintiff qualified for benefits, she possessed the residual functional capacity to perform a limited range of sedentary work. (Tr. at 16-17.) Sedentary work involves lifting no more than ten pounds at a time and occasionally lifting and carrying articles like docket files, ledgers and small tools. Although a sedentary job is defined as one that involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. 20 C.F.R. § 404.1567(a)(1991). Social Security Ruling 83-10 clarifies this definition:

> "Occasionally" means occurring from very little up to one-third of the time. Since being on one's feet is required "occasionally" at the sedentary level of exertion, periods of standing or walking should generally total no more than about 2 hours of an 8-hour workday, and sitting should generally total approximately 6 hours of an 8-hour workday. Work processes in specific jobs will dictate how often and how long a person will need to be on his or her feet to obtain or return small articles.

SSR 83-10.

After review of the record, I suggest that the ALJ utilized the proper legal standard in his application of the Commissioner's five-step disability analysis to Plaintiff's claim. I turn next to the consideration of whether substantial evidence supports the ALJ's decision.

#### 2.     Substantial Evidence

Plaintiff contends that the ALJ's decision is not supported by substantial evidence. (Doc. 8.) As noted earlier, if the Commissioner's decision is supported by substantial evidence, the decision must be affirmed even if this Court would have decided the matter differently and even where substantial evidence supports the opposite conclusion. *McClanahan,* 474 F.3d at 833;

*Mullen,* 800 F.2d at 545. In other words, where substantial evidence supports the ALJ's decision, it must be upheld.

Specifically, Plaintiff contends that the "ALJ's residual functional capacity finding and hypothetical question to the Vocational Expert failed to accurately portray Plaintiff's mental limitations." (Doc. 8 at 12-14.) Plaintiff contends that "in spite of the fact that the above cited evidence strongly suggests Plaintiff suffers mental limitations[,] the ALJ failed to find that she had any mental limitation in his Residual Functional Capacity (RFC) finding . . . [and] failed to include any mental limitations in his hypothetical questions to the Vocational Expert (VE) at the hearing." (Doc. 8 at 13.)

In his decision, the ALJ stated that Plaintiff "has major depressive disorder, an impairment resulting primarily from family stressors, treated with medication and psychotherapy with reported mood stability and decreased depression and anxiety." (Tr. at 17.) Therefore, the ALJ did not ignore mental impairments in his finding of residual functional capacity. In addition, the ALJ found that Plaintiff's major depressive disorder was a severe impairment in his analysis at Step Two. (Tr. at 13.) I suggest, however, that the ALJ's decision not to factor mental limitations into the hypothetical posed to the VE is supported by substantial evidence.

There is no evidence that Plaintiff's mental limitations had limiting effects on her ability to perform unskilled or semi-skilled sedentary work. Although Plaintiff was diagnosed with depression, the modest treatment she received, i.e., counseling and prescription drug treatment, indicates that her mental condition was not disabling. *See Myatt v. Comm'r of Soc. Sec.*, 251 Fed. App'x 332, 334-35 (6th Cir. 2007) (modest treatment regimen is inconsistent with a finding of total disability). In addition, as the ALJ noted, many of Plaintiff's stressors were related to her relationship with her daughter and there is no evidence that such stressors would be present in a

14

work environment. (Tr. at 17, 352, 354.) In addition, Plaintiff progressed well in counseling (Tr. at 387, 388, 390) and even Plaintiff's reported mood, energy, ambition, and activity improved throughout therapy. (Tr. at 350, 364, 380, 387, 388, 390.) Finally, Dr. Randolph concluded that Plaintiff "has the capacity to learn and retain new material." (Tr. at 431.)

I further suggest that the hypothetical posed to the VE properly incorporated the limitations found in the RFC assessment and was in harmony with the objective record medical evidence and Plaintiff's own statements that she folds laundry, makes simple meals, drives a car, sews, watches television, does crafts, and reads (Tr. at 57-59, 147), that she does not suffer from any side effects, such as drowsiness or dizziness, from her pain medication, and that her reported mood, energy, ambition, and activity improved during counseling. (Tr. at 350, 364, 380, 387, 388, 390.) *See Griffeth v. Comm'r of Soc. Sec.*, 217 Fed. App'x 425, 429 (6th Cir. 2007); *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987).

### 3. Conclusion

For all these reasons, after review of the record, I conclude that the decision of the ALJ, which ultimately became the final decision of the Commissioner, is within that "zone of choice within which decisionmakers may go either way without interference from the courts," *Felisky*, 35 F.3d at 1035, as the decision is supported by substantial evidence.

### III. REVIEW

The parties to this action may object to and seek review of this Report and Recommendation within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Frontier Ins. Co.*

*v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States v. Sullivan,* 431 F.3d 976, 984 (6th Cir. 2005).  The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation.  *McClanahan*, 474 F.3d at 837; *Frontier Ins. Co.,* 454 F.3d at 596-97.  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be concise, but commensurate in detail with the objections, and shall address specifically, and in the same order raised, each issue contained within the objections.

                                                s/ **Charles E Binder**
                                                CHARLES E. BINDER
Dated: November 16, 2011                United States Magistrate Judge.

**CERTIFICATION**

I hereby certify that this Report and Recommendation was electronically filed this date and served upon counsel of record via the Court's ECF System.

Date:  November 16, 2011                              By    s/Patricia T. Morris
                                                                            Law Clerk to Magistrate Judge Binder